UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


GARY NORTHINGTON,

                Plaintiff,                                Hon. Janet T. Neff

v.                                                Case No. 1:10 CV 424

JIM ARMSTRONG, et al.,

                Defendants.

_____/

## REPORT AND RECOMMENDATION

      This matter is before the Court on <u>Defendants Caruso, Martin, Russell and the Michigan</u> <u>Department of Corrections' Motion to Dismiss</u>. (Dkt. #103). Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Defendants' motion be **granted in part and denied in part**.


## BACKGROUND

      Plaintiff initiated this action on April 30, 2010, against 42 individuals, the Michigan Department of Corrections (MDOC), Correctional Medical Services (CMS), Prison Health Services (PHS), and various "unknown parties." In his sixty-four (64) page certified Second Amended Complaint, Plaintiff asserts numerous claims involving various allegations occurring over a three year period. The following *factual*[1] allegations are contained in Plaintiff's Second Amended Complaint. To avoid confusion, Plaintiff's allegations are outlined in the same manner as in his Second Amended Complaint.

_____

[1] In describing Plaintiff's various allegations, the Court has disregarded the numerous legal conclusions articulated by Plaintiff in his Amended Complaint, as well as the great many generalized factual allegations directed at no particular individual or entity.

A.    Allegation I

In May and June 2007, Plaintiff filed grievances against Defendant Berghuis regarding an alleged "laundry scheme," pursuant to which inmates were improperly charged for lost laundry. Plaintiff was warned by a prison employee "of the retaliation to come." On June 6, 2007, Defendants Berghuis and Shackleton transferred Plaintiff from the Brooks Correctional Facility to the Straits Correctional Facility. During this transfer, unidentified "MDOC officers. . .deliberately destroyed" two of Plaintiff's personal footlockers. This retaliatory conduct was "ordered by" Defendant Berghuis.

From July 1, 2007, through July 13, 2007, Defendant Campbell "said he would 'get Northington' and mentioned Plaintiff filing grievances." On July 13, 2007, at 1200 hours, Defendant Lawnichak authorized Plaintiff to attend chow. Defendant Campbell, however, alleging that Plaintiff arrived at the dining facility before 1200 hours, charged Plaintiff with a major misconduct violation for being "out of place." A prison employee later told Plaintiff that he had been charged with this violation as retaliation for asserting "complaints of embezzlement" against Defendant Berghuis. Plaintiff was later informed by another prison employee that "the misconduct [charge] was retaliation ordered from 'higher-up.'" On September 4, 2007, Defendants MDOC and Sherry ordered Plaintiff's transfer from the Straits Correctional Facility to the Kinross Correctional Facility. This transfer was ordered as "retaliation for Plaintiff asserting rights at misconduct hearing and through grievances."

On three occasions between May 31, 2007, and November 2, 2007, Defendant Menard and/or Defendant Overton charged Plaintiff's prisoner account five dollars for Health Service appointments Plaintiff did not request. This action was undertaken in retaliation for "Plaintiff seeking medical care. . .and defending his lawful rights." Defendants Armstrong, Berghuis, Brown, LaLonde, Woods, and MDOC were informed of this conduct, but refused to act for retaliatory purposes.

Defendants Armstrong, Berghuis, Brown, LaLonde, Menard, Overton, and Woods acted pursuant to an unwritten policy "to charge prisoners for Health Service callouts which were not chargeable under written policy and rules, often multiple times, as behavior modification tactic intended to deprive prisoners of medical care for life-threatening illness and disease, that depleted MDOC'[s] budget, based on budget constraints rather than medical need."

B.    Allegation II

Plaintiff suffers from airway necrosis, permanent injury to internal organs, scarred lungs, and severe respiratory disease.  Plaintiff also experiences "ever-increasing reaction with continued exposure to allergens common to certain locations of all MDOC prisons, and has an unresolved antibiotic resistant infection."  As a result, three or more times daily, Plaintiff's "respiratory airways swell shut and fill with fluids so he cannot breath[e] from 15-seconds to 2-minutes each time."  It takes "hours" for Plaintiff to recover from this incidents.  Plaintiff also experiences difficulty sleeping.  In February and March 2010, Defendant Kilaru denied Plaintiff care and subsequently determined that Plaintiff's various physical ailments were caused by "mental illness."

C.    Allegation III

On April 8, 2008, Plaintiff, who was experiencing a fever and pneumonia, submitted a health care request to which he received no response.  On three occasions between April 18, 2008, and June 5, 2008, Plaintiff "sent letters requesting medical care" and, furthermore, inquiring as to why he had still not received care in response to his April 8, 2008 request.  On June 10, 2008, Plaintiff met with Defendant Henson.  During this meeting, Plaintiff exhibited "raspy breathing and coughed-up fluids."

Plaintiff also reported that "he had not slept 4 of the last 5 nights because his lungs and respiratory airways swelled shut and filled with fluids." Defendant Henson concluded that "nothing was wrong" with Plaintiff and "refused to refer [him] for further care."

On June 20, 2008, Plaintiff was examined by Defendant Wilson who concluded that Plaintiff was suffering coniosis and scarred lungs caused by "lack of care." Defendant Wilson prescribed for Plaintiff a seven-day course of antibiotics. On June 29, 2008, Plaintiff requested "follow-up care" because his respiratory symptoms had returned. On July 2, 2008, Plaintiff was examined by Defendant Henson who falsely concluded that Plaintiff did not require medical care.

On three occasions between July 28, 2008, and September 3, 2008, Plaintiff informed Defendants CMS, Armstrong, Ball, Berlinger, Cunningham, Filion, Jenkins, malloy, Martin, MDOC, Stephenson, Sibbald, and Woods that his "airways [were] filling shut [and] filling with fluids" which prevented him from sleeping. These Defendants "refused to see [that] Plaintiff got proper medical care."

On November 19, 2008, February 12, 2009, and March 12, 2009, Dr. Nagarja and Defendant Piazza prescribed for Plaintiff antibiotics which eliminated his symptoms. Five days after these prescriptions expired, however, Plaintiff's symptoms returned. In March 2009, Defendant Piazza informed Plaintiff that "past lack of care" was the cause of his airway necrosis.

While Plaintiff was taking his prescribed antibiotics, he experienced a "severe allergic reaction" to laundry detergent, disinfectant, cocoa butter lotion, soap, and bath powder. On three occasions between March 2009 and June 2009, Defendant Piazza "said he should issue but refused to issue [a] special accommodation to prevent Plaintiff being exposed to such allergens." Defendants Cunningham and Woods "refused to let Defendant Piazza issue [a] special accommodation" to Plaintiff. On or about June 15, 2009, Defendants Mackie, Martin, Woods, and MDOC "prohibited Defendant

Piazza [from] issuing [a] special accommodation for Plaintiff to be in a single-man cell." Defendants Berlinger and Sibbald subsequently "obstructed administrative relief."

In April and July 2009, Defendants Cunningham and Henson "cancelled Plaintiff's regular chronic care and other appointments contrary to orders of Dr. Piazza made in February, March and June 2009." This action was taken in retaliation "for Plaintiff's past grievances and letters of complaint." Defendants Ball, Filion, Henson, Jenkins, Martin, and Stephenson "refused to correct this." Defendants Cunningham, Ball, Jenkins, Stephenson, and Martin (on an unspecified date or dates) "ignored Dr. Piazza by refusing to timely refill his order for Flagyl antibiotics."

On December 5, 2009, at 6:40 p.m., Plaintiff went to Health Services "because of constant gagging." When he arrived at Health Services, Defendant Filion told Plaintiff, "you're just going to have to put up with it." At 10:00 p.m., Plaintiff returned to Health Services. Plaintiff's throat was swollen and he "coughed-up fluids. . .every 20-seconds." Defendant Manzardo told Plaintiff to "live with it" and gave him seven honey packets with instructions to "use in hot tea." At 10:30 p.m., Plaintiff drank hot tea into which he had poured one of the honey packets. Plaintiff immediately vomited and "had a more swollen throat." Plaintiff then contacted Health Services by telephone and was told by Defendant Manzardo to "live with it."

On December 22, 2009, Defendant Millette told Plaintiff that he: (1) would not attempt to uncover the cause of Plaintiff's respiratory illness; (2) would not issue a special accommodation to prevent Plaintiff being exposed to life-threatening allergens; and (3) would not order tests to determine the allergens in question. Plaintiff informed Defendant Russell of these various denials of medical treatment, but Russell "refused to correct them."

On December 23, 2009, Defendants Cunningham, Mackie, Olson, and/or Woods transferred Plaintiff from the Kinross Correctional Facility to the Mound Correctional Facility "in retaliation for his grievances and letters of complaint seeking proper care and remedy for his illness."

In February and March 2010, Plaintiff was examined by Defendant Kilaru who informed Plaintiff that his "lungs were scarred and he had coniosis from MDOC's prior lack of care." Defendant Kilaru "refused to do anything" to determine the cause of or treat Plaintiff's symptoms or illness. Plaintiff informed Defendant Kilaru that his "throat swells shut and fills with fluids" when exposed to: (1) aroma; (2) dust; (3) fumes or vapors from cocoa butter lotions and soaps; (4) bath powder; (5) laundry detergent; (6) disinfectant; and (7) certain soaps. Plaintiff asked Defendant Kilaru to perform testing to determine the cause of his various allergic reactions that cause his throat to "swell shut and fill with fluids." Defendant Kilaru responded that "he would not order test(s) to determine allergens, nor determine cause of or treat allergies." Defendant Kilaru also refused Plaintiff's request for a special accommodation to prevent his exposure to these allergens.

Every month from December 2009 through June 2010, Defendants Caruso, Martin, Perea, Russell, MDOC, and PHS were informed of the aforementioned conduct of Defendants Cunningham, Filion, Kilaru, Manzardo, Millette, Piazza, but "refused to end the denial(s) of medical care to Plaintiff."


D.     Allegation IV

On November 14, 2008, Plaintiff was involuntarily moved into a "common cell" with two other inmates, Defendants Barclay and Portes. Plaintiff was moved in retaliation for "filing grievances and complaints." From November 14, 2008, through, December 23, 2009, Defendants Barclay and Portes knowingly and deliberately "exposed Plaintiff to allergens" causing Plaintiff's

condition to worsen. Defendants Barclay and Portes also "would stay awake and create loud noises" at night to prevent Plaintiff from sleeping. Defendants Armstrong, Caruso, Harrington, Harwood, Isard, LaLonde, Mackie, Olson, Sibbald, and Woods were informed of the "unnecessary night-time noises and disturbances being caused by Defendants Barclay and Portes," but "took no action." The conduct by Defendants Barclay and Portes was "orchestrated" by unknown officials of the Michigan State Police. On several occasions, Plaintiff requested to be moved to another cell, but his requests were denied by Defendants Harrington, Harwood, Isard, LaLonde, Mackie, Olson, and Woods.

E.     Allegation V

Between April 21, 2008, and September 16, 2008, Defendant Berlinger denied several grievances Plaintiff filed. On September 17, 2008, Defendants Berlinger and Woods placed Plaintiff on modified grievance access in retaliation for "Plaintiff's past grievances." On October 21, 2008, Defendant Berlinger denied Plaintiff's request to file a grievance. On October 22, 2008, Defendant Isard, at Defendant Berlinger's request, falsely charged Plaintiff with a major misconduct violation. Between October 24, 2008, and December 23, 2009, Defendant Berlinger denied numerous grievances and/or requests for grievances submitted by Plaintiff.

On three occasions between June 11, 2008, and July 31, 2008, Defendants Armstrong, Ball, Brown, Filion, Laitenen, LaLonde, Mallette, Stephenson, and Woods denied grievances that Plaintiff filed. Defendants Jenkins, Malloy, and Martin (on an unspecified date) denied a grievance that Plaintiff filed. On three occasions between April 30, 2009, and July 21, 2009, Defendants Cunningham and Henson "cancelled Plaintiff's doctor-ordered appointments." Defendant Martin "refused to correct this." On August 18, 2009, Defendant Cunningham "cancelled Plaintiff's doctor-ordered Flagyl

medication." On December 5, 2009, Defendants Filion and Manzardo denied Plaintiff emergency care when Plaintiff was suffering respiratory failure. Between December 23, 2009, and May 26, 2010, Defendants Berlinger, Olson, Perea, Russell, Sibbald, Whitfield, and Woods denied or refused to answer numerous grievances filed by Plaintiff.

In 1997, 2004, October 2008, and February 2010, Defendants Cunnigham, CMS, Kilaru, MDOC and PHS avoided treating Plaintiff by falsely accusing him of suffering from mental illness. In June 2010, Defendant Kilaru refused to issue Plaintiff a special accommodation so that Plaintiff could avoid exposure to "deadly allergens."

Plaintiff alleges that all these actions were undertaken in retaliation for having exercised his constitutional rights.

F.      Allegation VI

As of December 22, 2009, a "medical hold" prevented Plaintiff from being transferred to another facility. On December 22, 2009, Defendant Millette "entered false information in Plaintiff's medical records" removing the medical hold. The following day, Defendants Cunningham, Henson, Olson, and Woods transferred Plaintiff from the Kinross Correctional Facility to the Mound Correctional Facility "in retaliation for asserting rights to proper medical care through grievances and letters."

G.     Allegation VII

From April 2009 through May 2010, Plaintiff requested that the MDOC "issue [a] declaratory ruling" regarding certain provisions of the MDOC prisoner grievance policy.  The MDOC did not respond to Plaintiff's request.  Plaintiff alleges that Defendants MDOC and PHS "say unwritten policy and practice may be used to deny needed medical care, which persons outside prison normally get."  Plaintiff asserts that such is not permissible.  Plaintiff requests a "declaratory ruling" on these matters as such "would end confusion."

H.     Allegation VIII

Plaintiff is a "suspect" in an "ongoing criminal investigation."  When questioned on this matter, Plaintiff "continually asserts his right to remain silent."  In response, Defendants Armstrong, Barclay, Isard, Newman, Portes, and Woods "subjected Plaintiff to sleep deprivation, threats on his life and well-being, assaults and demanded incriminating responses. . .with the intent to deprive Plaintiff of his right to remain silent and [right to] counsel in the ongoing investigation."

Defendants Caruso, Martin, Russell, and MDOC now move to dismiss Plaintiff's claims on the grounds that Plaintiff's allegations fail to state a claim on which relief may be granted.

**STANDARD**

A Rule 12(b)(6) motion to dismiss for failure to state a claim on which relief may be granted tests the legal sufficiency of a complaint by evaluating the assertions therein in a light most favorable to Plaintiff to determine whether such states a valid claim for relief.  *See In re NM Holdings Co., LLC*, 622 F.3d 613, 618 (6th Cir. 2000).

As the Supreme Court recently stated, a motion to dismiss will be denied only where the "[f]actual allegations [are] enough to raise a right for relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). As the Supreme Court more recently held, to survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, - - - U.S. - - -, 129 S.Ct. 1937, 1949 (2009). This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." If the complaint simply pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* As the Court further observed:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . .Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. . .Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the wellpleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not "show[n]" - "that the pleader is entitled to relief."

*Id.* at 1949-50 (internal citations omitted).

When resolving a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case, and exhibits attached to the defendant's motion to dismiss provided such are referenced in the complaint

and central to the claims therein.  *See Bassett v. National Collegiate Athletic Assoc.*, 528 F.3d 426, 430

(6th Cir. 2008); *see also*, *Continental Identification Products, Inc. v. EnterMarket, Corp.*, 2008 WL

51610 at *1, n.1 (W.D. Mich., Jan. 2, 2008) ("an exhibit to a pleading is considered part of the pleading"

and "the Court may properly consider the exhibits. . .in determining whether the complaint fail[s] to

state a claim upon which relief may be granted without converting the motion to a Rule 56 motion");

*Stringfield v. Graham*, 212 Fed. Appx. 530, 535 (6th Cir. 2007) (documents "attached to and cited by"

the complaint are "considered parts thereof under Federal Rule of Civil Procedure 10(c)").


## ANALYSIS

I.          **Defendant Michigan Department of Corrections**

Plaintiff has sued the Michigan Department of Corrections (MDOC).  The MDOC is not

a person under 42 U.S.C. § 1983 and, furthermore, enjoys immunity from suit under the Eleventh

Amendment.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989); *Hamilton's Bogarts,*

*Inc. v. Michigan*, 501 F.3d 644, 654 n.8 (6th Cir. 2007); *Parker v. Michigan Department of Corrections*,

65 Fed. Appx. 922, 923 (6th Cir., Mar. 12, 2003).  Accordingly, the undersigned recommends that

Plaintiff's claims against the MDOC be dismissed.


II.          **Defendant Caruso**

In Counts II-IV of his Second Amended Complaint, Plaintiff asserts that Defendant

Caruso denied him medical care and also subjected him to inhumane conditions in violation of his

Eighth Amendment right to be free from cruel and unusual punishment.  (Dkt. #15 at ¶¶ 131-40).  In

Counts V-VI of his Second Amended Complaint Plaintiff asserts that Defendant Caruso failed to

properly supervise prison officials who allegedly subjected him to unlawful retaliation.  (Dkt. #15 at ¶¶ 141-50).

Throughout his Second Amended Complaint, Plaintiff alleges that Defendant Caruso failed to properly supervise various subordinates.  (Dkt. #15 at ¶¶ 30, 59, 60, 76, 97, 99, 100).  Liability in a § 1983 action cannot be based upon a theory of respondeat superior or vicarious liability, as Plaintiff must instead allege personal involvement by a particular defendant.  *See Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999) (liability is not to be found in passive behavior or an alleged failure to act, rather liability must be based upon "active unconstitutional behavior"); *Salehpour v. University of Tennessee*, 159 F.3d 199, 206-07 (6th Cir. 1998); *Loggins v. Franklin County, Ohio*, 218 Fed. Appx. 466, 470 (6th Cir., Mar. 1, 2007); *Ingram v. Jewell*, 94 Fed. Appx. 271, 273 (6th Cir., Mar. 24, 2004).  The undersigned recommends, therefore, that these particular claims against Defendant Caruso be dismissed.

Many of the "allegations" asserted against Defendant Caruso in Plaintiff's Second Amended Complaint are nothing more than legal conclusions which fail to state a claim on which relief may be granted.  (Dkt. #15 at ¶¶ 17, 25, 30, 49, 50, 61, 68, 76).  Plaintiff's statement that Defendant Caruso was informed that "Kinross Facility cells were too overcrowded" likewise fails to state a claim, as it does not allege any wrongdoing by Defendant Caruso.  (Dkt. #15 at ¶ 80).  Accordingly, the undersigned recommends that these various claims be dismissed.

Plaintiff also alleges that Defendant Caruso pursued a policy to deny all prisoner grievances and on one occasion denied a hearing on a grievance.  (Dkt. #15 at ¶¶ 82, 83, 96).  Claims that a prison official denied or failed to properly respond to a grievance do not state a claim.  *See Skinner v. Govorchin*, 463 F.3d 518, 525-26 (6th Cir. 2006); *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir.

1999); *Lee v. Michigan Parole Board*, 2004 WL 1532563 at *2 (6th Cir., June 23, 2004); *Alder v. Correctional Medical Services*, 2003 WL 22025373 at *2 (6th Cir., Aug. 27, 2003). Likewise, Plaintiff's allegation that Defendant Caruso denied a hearing on a grievance fails to state a claim. *See, e.g., Yoon v. Arnett*, 385 Fed. Appx. 666,668 (9th Cir., June 22, 2010) (prisoners have no right "to the handling of grievances in any particular manner"); *Heleva v. Kramer*, 214 Fed. Appx. 244, 247 (3rd Cir., Jan. 29, 2007) (because "[p]risoners do not have a constitutional right to prison grievance procedures. . .defendants' alleged obstruction of such procedures is not independently actionable"); *Barnes v. Fedele*, - - - F.Supp.2d - - -, 2011 WL 160551 at *6 (W.D.N.Y., Jan. 13, 2011) (a prisoner "has no constitutional right to have his grievances processed or investigated in any particular manner"). The undersigned recommends, therefore, that these particular claims be dismissed.

As noted above, Plaintiff alleges that on November 14, 2008, he was moved into a cell with Defendants Barclay and Portes. (Dkt. #15 at ¶¶ 70-71). Plaintiff alleges that "each night" between November 14, 2008, and December 23, 2009, Defendants Barclay and Portes "would stay awake and create loud noises" to prevent Plaintiff from sleeping. (Dkt. #15 at ¶ 75). According to Plaintiff, "if it appeared the loud noises did not wake him," Defendant Barclay "would beat on Plaintiff's bed." *Id.* Plaintiff alleges that as a result he obtained "less than four hours of sleep most nights" and on "three different times went seven (7) days straight with nothing more than a few five-minute naps." (Dkt. #15 at ¶¶ 84-85).

Plaintiff asserts that on four occasions between April 5, 2009, and December 10, 2009, he informed Defendant Caruso "of the unnecessary night-time noises and disturbances being caused by Defendants Barclay and Portes." (Dkt. #15 at ¶ 81). Plaintiff alleges that in response, Defendant Caruso "took no action," but instead allowed the behavior in question to continue. (Dkt. #15 at ¶¶ 81, 84).

Plaintiff alleges that "as a result of this lack of sleep, [he] suffered severe physical and mental fatigue, listlessness, headaches, emotional, immune and respiratory problems." (Dkt. #15 at ¶ 85). Plaintiff further alleges that he experienced "increased scarring of [his] lungs and airways," as well as "other organ damage." *Id.*

The Eighth Amendment's prohibition against cruel and unusual punishment applies not only to punishment imposed by the state, but also to deprivations which occur during imprisonment and are not part of the sentence imposed. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The analysis by which Defendant Caruso's conduct is evaluated consists of two-steps. First, the Court must determine, objectively, whether the alleged deprivation was sufficiently serious. In this respect, Plaintiff "must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

With respect to the objective prong of the analysis, contemporary standards of decency determine whether conditions of confinement are cruel and unusual. *See Hadix v. Johnson*, 367 F.3d 513, 525 (6th Cir. 2004) (citing *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)). Contemporary standards of decency are violated only by "extreme deprivations" which deprive the prisoner of the "minimal civilized measure of life's necessities." *Hadix*, 367 F.3d at 525 (quoting *Hudson v. McMillan*, 503 U.S. 1, 9 (1992)). Exposure to excessive noise satisfies this prong of the analysis if "the noise level is so grave that it violated contemporary standards of decency to expose anyone unwillingly to such a risk." *Hoeft v. Kasten*, 691 F.Supp.2d 927, 930 (W.D. Wis. 2010) (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).

If the objective test is met, the Court must then determine whether Defendant acted with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834. In other words, was she deliberately

indifferent to Plaintiff's health or safety.  *Id.*  However, the Eighth Amendment is not implicated where prison officials simply acted with negligence.  *See Perez v. Oakland County*, 466 F.3d 416, 423 (6th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976)).  In sum, to establish that Defendant acted with deliberate indifference, Plaintiff must "present evidence from which a trier of fact could conclude 'that the official was subjectively aware of the risk' and 'disregard[ed] that risk by failing to take reasonable measures to abate it.'"  *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (quoting *Farmer*, 511 U.S. at 829, 847).

Plaintiff alleges that over the course of more than one year he was nightly subjected to significant noise-induced sleep deprivation that caused him to experience severe physical injury.  Taking Plaintiff's allegations as true, a reasonable juror could conclude that such a circumstance constitutes an extreme deprivation that deprived Plaintiff of the minimal civilized measure of life's necessities.  As for the subjective component of the analysis, Plaintiff alleges that Defendant Caruso was informed of this circumstance, but failed to take action to protect Plaintiff.  Accordingly, the undersigned recommends that Defendant Caruso's motion to dismiss be **denied** as to this particular claim.[2]

In sum, the undersigned recommends that Defendant Caruso's motion to dismiss be **granted in part and denied in part** as detailed above.

III.        **Defendant Russell**

In Counts II-IV of his Second Amended Complaint, Plaintiff asserts that Defendant Russell denied him medical care and also subjected him to inhumane conditions in violation of his

---

[2]  The undersigned also recommends that Defendant Caruso is not entitled to qualified immunity as to this claim, as a reasonable person would have known that subjecting a prisoner to long-term sleep deprivation causing serious physical injury violated the Eighth Amendment.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Eighth Amendment right to be free from cruel and unusual punishment. (Dkt. #15 at ¶¶ 131-40). In Counts V-VI of his Second Amended Complaint Plaintiff asserts that Defendant Russell failed to properly supervise prison officials who allegedly subjected him to unlawful retaliation. (Dkt. #15 at ¶¶ 141-50).

Plaintiff alleges that Defendant Russell failed to properly supervise various subordinates. (Dkt. #15 at ¶¶ 47, 59, 60, 97-100). As discussed in the preceding section, liability in a § 1983 action cannot be based upon a theory of respondeat superior or vicarious liability, as Plaintiff must instead allege personal involvement by a particular defendant. Accordingly, the undersigned recommends that these particular claims against Defendant Russell be dismissed. Moreover, many of the "allegations" asserted against Defendant Russell in Plaintiff's Second Amended Complaint are nothing more than legal conclusions which fail to state a claim on which relief may be granted. (Dkt. #15 at ¶¶ 25, 49, 50, 61).

Finally, Plaintiff alleges that Defendant Russell "refused to answer" two of his many prison grievances in retaliation for "filing grievances and letters of complaint." (Dkt. #15 at ¶¶ 90-91). The elements of a First Amendment retaliation claim are well known: (1) Plaintiff was engaged in constitutionally protected conduct, (2) Plaintiff suffered adverse action which would deter a person of "ordinary firmness" from continuing to engage in such protected conduct, and (3) there exists a causal connection between the protected conduct and the adverse action - in other words, the adverse action was motivated at least in part by Plaintiff's protected conduct. *See Thomas v. Eby*, 481 F.3d 434, 440 (6th Cir. 2007) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)).

While Plaintiff's allegations satisfy the first element of the analysis, such come up short as to the other two elements. Plaintiff alleges that Defendant Russell "refused to answer" two

grievances he filed.  Such does not constitute adverse action sufficient to deter a person of ordinary firmness from continuing to engage in protected conduct.  *See, e.g., Burgos v. Canino*, 641 F.Supp.2d 443, 454-55 (E.D. Pa. 2009) ("[t]he mere denial of grievances does not rise to the level of adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights"); *Alexander v. Fritch*, 2010 WL 1257709 at *18 (W.D. Pa., Mar. 26, 2010) (same); *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002) ("inconsequential actions" do not satisfy the "adverse action requirement").  With respect to the casual connection element, Plaintiff fails to articulate a chronology of events from which retaliation may plausibly be inferred, but instead offers nothing but "bare allegations of malice," which is insufficient to state a claim.  *See Thaddeus-X*, 175 F.3d at 399; *Desmone v. Adams*, 1998 WL 702342 at *3 (6th Cir., Sep. 23, 1998).

The undersigned recommends, therefore, that Defendant Russell's motion to dismiss be **granted**.


**IV.          Defendant Martin**

In Counts II-IV of his Second Amended Complaint, Plaintiff asserts that Defendant Martin denied him medical care and also subjected him to inhumane conditions in violation of his Eighth Amendment right to be free from cruel and unusual punishment.  (Dkt. #15 at ¶¶ 131-40).  In Counts V-VI of his Second Amended Complaint Plaintiff asserts that Defendant Martin failed to properly supervise prison officials who allegedly subjected him to unlawful retaliation.  (Dkt. #15 at ¶¶ 141-50).

Plaintiff alleges that Defendant Martin failed to properly supervise various subordinates. (Dkt. #15 at ¶¶ 30, 59, 60, 76, 99, 100).  As previously noted, however, liability in a § 1983 action

cannot be based upon a theory of respondeat superior or vicarious liability, as Plaintiff must instead allege personal involvement by a particular defendant. The undersigned recommends, therefore, that these particular claims against Defendant Martin be dismissed. Plaintiff next alleges that Defendant Martin denied his request for a hearing concerning a grievance he filed. (Dkt. #15 at ¶¶ 96). As previously discussed, the allegation that Defendant Martin denied a hearing on a grievance fails to state a claim. Plaintiff has also asserted against Defendant Martin many "allegations" that are nothing more than legal conclusions which fail to state a claim on which relief may be granted. (Dkt. #15 at ¶¶ 17, 25, 30, 49, 50, 61, 68, 76). Finally, Plaintiff alleges that on June 15, 2009, Defendant Martin instructed Defendant Piazza to not issue to Plaintiff a special accommodation to be placed in a single person cell. (Dkt. #15 at ¶ 33). This allegation fails to state a claim because Plaintiff has not alleged that Defendant Martin undertook this action with knowledge that Plaintiff was suffering a serious medical condition that warranted such an accommodation. In other words, Plaintiff has failed to allege that Defendant Martin acted with a "sufficiently culpable state of mind."

Plaintiff has, however, asserted several allegations that state a claim on which relief may be granted. Plaintiff asserts that on July 28, 2008, August 31, 2008, and September 3, 2008, Defendant Martin, despite knowledge that Plaintiff was suffering from a serious medical condition, failed to secure for Plaintiff appropriate medical care. (Dkt. #15 at ¶ 33). Plaintiff also alleges that Defendant Martin "ignored" Defendant Piazza's treatment directives and refused to timely refill a prescription for antibiotics. (Dkr. #15 at ¶ 41). While less than artfully worded, these particular allegations satisfy the aforementioned standard and state a claim on which relief may be granted.[3]

---

[3] The undersigned also recommends that Defendant Martin is not entitled to qualified immunity as to these claims, as a reasonable person would have known that denying medical treatment and prescription medication to a prisoner experiencing a serious medical condition violated the Eighth Amendment. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In sum, the undersigned recommends that Defendant Martin's motion to dismiss be **granted in part and denied in part** as detailed above.

**V.          Request for Declaratory Relief**

In Count VII of his Second Amended Complaint, Plaintiff asserts that he "requested declaratory ruling" from Defendants Caruso and MDOC "to end confusion" regarding the application of a "grievance procedure clause." (Dkt. #15 at ¶ 152). Plaintiff also asserts that he "requested declaratory ruling" from Defendants Caruso and MDOC "to eliminate confusion" regarding the application of a "medical care policy." (Dkt. #15 at ¶ 153). Plaintiff asserts that Defendants "did not answer" his requests. (Dkt. #15 at ¶¶ 152-53). Asserting that he "has [a] right to declaratory ruling," Plaintiff asserts a "Request for Declaratory Ruling." (Dkt. #15 at ¶¶ 151-54).

Pursuant to the Declaratory Judgment Act, the Court "*may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201 (emphasis added). In passing the Declaratory Judgment Act, Congress "created an opportunity, rather than a duty, to grant a new form of relief." *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 554 (6th Cir. 2008) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995)). When determining whether to declare the rights of litigants (i.e., entertain a declaratory action), the federal district courts are "afforded substantial discretion." *Flowers*, 513 F.3d at 554 (citing *Wilton*, 515 U.S. at 289).

In applying this standard, courts are instructed to consider the following factors: (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is

being used merely for the purpose of "procedural fencing" or "to provide an arena for res judicata"; (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective. These factors are not necessarily considered equally and none of these factors is dispositive. *Flowers*, 513 F.3d at 554-63.

Consideration of these factors leads the Court to conclude that entertaining Plaintiff's request for declaratory relief is not appropriate. A declaratory judgment action is appropriate where a party or parties requires a judicial determination as to their rights and/or obligations. Plaintiff, however, appears instead to be asking the Court to render an opinion as to its interpretation of the policies in question. The Declaratory Judgment Act was not intended to authorize undue interference by the federal courts in the day-to-day operation of state correctional facilities. Plaintiff's right to not be subjected to cruel and unusual punishment, as well as his right to petition the government for redress of grievances is not in question.

It is also not clear whether Plaintiff is attempting to obtain a declaratory ruling as pertains to past or future events. To the extent that Plaintiff is seeking a declaration regarding future events, such would encroach on the State of Michigan's authority to manage its prison population. Such a declaration would also appear to improperly seek judicial intervention as to a matter which is not ripe for adjudication. To the extent that Plaintiff seeks a declaration as to events which have already transpired, the Court finds that a traditional action for damages is much more appropriate. Accordingly, the undersigned recommends that the Court decline to entertain Plaintiff's request for declaratory relief and that such claim be **dismissed**.

## **CONCLUSION**

For the reasons articulated herein, the undersigned recommends that <u>Defendants Caruso, Martin, Russell and the Michigan Department of Corrections' Motion to Dismiss</u>, (dkt. #103), be **granted in part and denied in part**. Specifically, the undersigned recommends that Plaintiff's claims against Defendants MDOC and Russell be dismissed.

The undersigned recommends that Plaintiff's claims against Defendant Caruso be dismissed save for his claim that on four occasions between April 5, 2009, and December 10, 2009, Defendant Caruso ignored Plaintiff's requests to alleviate the nightly sleep deprivation he was experiencing and which caused him to experience severe physical injury.

The undersigned recommends that Plaintiff's claims against Defendant Martin be dismissed save for the following claims: (1) on July 28, 2008, August 31, 2008, and September 3, 2008, Defendant Martin, despite knowledge that Plaintiff was suffering from a serious medical condition, failed to secure for Plaintiff appropriate medical care; and (2) Defendant Martin "ignored" Defendant Piazza's treatment directives and refused to timely refill a prescription for antibiotics.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted,

Date: April 5, 2011

       /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge