UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY NORTHINGTON,

       Plaintiff,                               Hon. Janet T. Neff

v.                                                  Case No. 1:10 CV 424

JIM ARMSTRONG, et al.,

       Defendants.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on <u>Defendants Piazza, Wilson, and Correctional Medical Services, Inc.'s Motion to Dismiss</u>. (Dkt. #84). Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Defendants' motion be **granted in part and denied in part**.

## BACKGROUND

Plaintiff initiated this action on April 30, 2010, against 42 individuals, the Michigan Department of Corrections (MDOC), Correctional Medical Services (CMS), Prison Health Services (PHS), and various "unknown parties." In his sixty-four (64) page certified Second Amended Complaint, Plaintiff asserts numerous claims involving various allegations occurring over a three year period. The following *factual*[1] allegations are contained in Plaintiff's Second Amended Complaint. To avoid confusion, Plaintiff's allegations are outlined in the same manner as in his Second Amended Complaint.

---

[1] In describing Plaintiff's various allegations, the Court has disregarded the numerous legal conclusions articulated by Plaintiff in his Amended Complaint, as well as the great many generalized factual allegations directed at no particular individual or entity.

A.      Allegation I

In May and June 2007, Plaintiff filed grievances against Defendant Berghuis regarding an alleged "laundry scheme," pursuant to which inmates were improperly charged for lost laundry. Plaintiff was warned by a prison employee "of the retaliation to come." On June 6, 2007, Defendants Berghuis and Shackleton transferred Plaintiff from the Brooks Correctional Facility to the Straits Correctional Facility. During this transfer, unidentified "MDOC officers. . .deliberately destroyed" two of Plaintiff's personal footlockers. This retaliatory conduct was "ordered by" Defendant Berghuis.

From July 1, 2007, through July 13, 2007, Defendant Campbell "said he would 'get Northington' and mentioned Plaintiff filing grievances." On July 13, 2007, at 1200 hours, Defendant Lawnichak authorized Plaintiff to attend chow. Defendant Campbell, however, alleging that Plaintiff arrived at the dining facility before 1200 hours, charged Plaintiff with a major misconduct violation for being "out of place." A prison employee later told Plaintiff that he had been charged with this violation as retaliation for asserting "complaints of embezzlement" against Defendant Berghuis. Plaintiff was later informed by another prison employee that "the misconduct [charge] was retaliation ordered from 'higher-up.'" On September 4, 2007, Defendants MDOC and Sherry ordered Plaintiff's transfer from the Straits Correctional Facility to the Kinross Correctional Facility. This transfer was ordered as "retaliation for Plaintiff asserting rights at misconduct hearing and through grievances."

On three occasions between May 31, 2007, and November 2, 2007, Defendant Menard and/or Defendant Overton charged Plaintiff's prisoner account five dollars for Health Service appointments Plaintiff did not request. This action was undertaken in retaliation for "Plaintiff seeking medical care. . .and defending his lawful rights." Defendants Armstrong, Berghuis, Brown, LaLonde, Woods, and MDOC were informed of this conduct, but refused to act for retaliatory purposes.

Defendants Armstrong, Berghuis, Brown, LaLonde, Menard, Overton, and Woods acted pursuant to an unwritten policy "to charge prisoners for Health Service callouts which were not chargeable under written policy and rules, often multiple times, as behavior modification tactic intended to deprive prisoners of medical care for life-threatening illness and disease, that depleted MDOC'[s] budget, based on budget constraints rather than medical need."

B.   Allegation II

Plaintiff suffers from airway necrosis, permanent injury to internal organs, scarred lungs, and severe respiratory disease. Plaintiff also experiences "ever-increasing reaction with continued exposure to allergens common to certain locations of all MDOC prisons, and has an unresolved antibiotic resistant infection." As a result, three or more times daily, Plaintiff's "respiratory airways swell shut and fill with fluids so he cannot breath[e] from 15-seconds to 2-minutes each time." It takes "hours" for Plaintiff to recover from this incidents. Plaintiff also experiences difficulty sleeping. In February and March 2010, Defendant Kilaru denied Plaintiff care and subsequently determined that Plaintiff's various physical ailments were caused by "mental illness."

C.   Allegation III

On April 8, 2008, Plaintiff, who was experiencing a fever and pneumonia, submitted a health care request to which he received no response. On three occasions between April 18, 2008, and June 5, 2008, Plaintiff "sent letters requesting medical care" and, furthermore, inquiring as to why he had still not received care in response to his April 8, 2008 request. On June 10, 2008, Plaintiff met with Defendant Henson. During this meeting, Plaintiff exhibited "raspy breathing and coughed-up fluids."

Plaintiff also reported that "he had not slept 4 of the last 5 nights because his lungs and respiratory airways swelled shut and filled with fluids." Defendant Henson concluded that "nothing was wrong" with Plaintiff and "refused to refer [him] for further care."

On June 20, 2008, Plaintiff was examined by Defendant Wilson who concluded that Plaintiff was suffering coniosis and scarred lungs caused by "lack of care." Defendant Wilson prescribed for Plaintiff a seven-day course of antibiotics. On June 29, 2008, Plaintiff requested "follow-up care" because his respiratory symptoms had returned. On July 2, 2008, Plaintiff was examined by Defendant Henson who falsely concluded that Plaintiff did not require medical care.

On three occasions between July 28, 2008, and September 3, 2008, Plaintiff informed Defendants CMS, Armstrong, Ball, Berlinger, Cunningham, Filion, Jenkins, malloy, Martin, MDOC, Stephenson, Sibbald, and Woods that his "airways [were] filling shut [and] filling with fluids" which prevented him from sleeping. These Defendants "refused to see [that] Plaintiff got proper medical care."

On November 19, 2008, February 12, 2009, and March 12, 2009, Dr. Nagarja and Defendant Piazza prescribed for Plaintiff antibiotics which eliminated his symptoms. Five days after these prescriptions expired, however, Plaintiff's symptoms returned. In March 2009, Defendant Piazza informed Plaintiff that "past lack of care" was the cause of his airway necrosis.

While Plaintiff was taking his prescribed antibiotics, he experienced a "severe allergic reaction" to laundry detergent, disinfectant, cocoa butter lotion, soap, and bath powder. On three occasions between March 2009 and June 2009, Defendant Piazza "said he should issue but refused to issue [a] special accommodation to prevent Plaintiff being exposed to such allergens." Defendants Cunningham and Woods "refused to let Defendant Piazza issue [a] special accommodation" to Plaintiff. On or about June 15, 2009, Defendants Mackie, Martin, Woods, and MDOC "prohibited Defendant

Piazza [from] issuing [a] special accommodation for Plaintiff to be in a single-man cell." Defendants Berlinger and Sibbald subsequently "obstructed administrative relief."

In April and July 2009, Defendants Cunningham and Henson "cancelled Plaintiff's regular chronic care and other appointments contrary to orders of Dr. Piazza made in February, March and June 2009." This action was taken in retaliation "for Plaintiff's past grievances and letters of complaint." Defendants Ball, Filion, Henson, Jenkins, Martin, and Stephenson "refused to correct this." Defendants Cunningham, Ball, Jenkins, Stephenson, and Martin (on an unspecified date or dates) "ignored Dr. Piazza by refusing to timely refill his order for Flagyl antibiotics."

On December 5, 2009, at 6:40 p.m., Plaintiff went to Health Services "because of constant gagging." When he arrived at Health Services, Defendant Filion told Plaintiff, "you're just going to have to put up with it." At 10:00 p.m., Plaintiff returned to Health Services. Plaintiff's throat was swollen and he "coughed-up fluids. . .every 20-seconds." Defendant Manzardo told Plaintiff to "live with it" and gave him seven honey packets with instructions to "use in hot tea." At 10:30 p.m., Plaintiff drank hot tea into which he had poured one of the honey packets. Plaintiff immediately vomited and "had a more swollen throat." Plaintiff then contacted Health Services by telephone and was told by Defendant Manzardo to "live with it."

On December 22, 2009, Defendant Millette told Plaintiff that he: (1) would not attempt to uncover the cause of Plaintiff's respiratory illness; (2) would not issue a special accommodation to prevent Plaintiff being exposed to life-threatening allergens; and (3) would not order tests to determine the allergens in question. Plaintiff informed Defendant Russell of these various denials of medical treatment, but Russell "refused to correct them."

On December 23, 2009, Defendants Cunningham, Mackie, Olson, and/or Woods transferred Plaintiff from the Kinross Correctional Facility to the Mound Correctional Facility "in retaliation for his grievances and letters of complaint seeking proper care and remedy for his illness."

In February and March 2010, Plaintiff was examined by Defendant Kilaru who informed Plaintiff that his "lungs were scarred and he had coniosis from MDOC's prior lack of care." Defendant Kilaru "refused to do anything" to determine the cause of or treat Plaintiff's symptoms or illness. Plaintiff informed Defendant Kilaru that his "throat swells shut and fills with fluids" when exposed to: (1) aroma; (2) dust; (3) fumes or vapors from cocoa butter lotions and soaps; (4) bath powder; (5) laundry detergent; (6) disinfectant; and (7) certain soaps. Plaintiff asked Defendant Kilaru to perform testing to determine the cause of his various allergic reactions that cause his throat to "swell shut and fill with fluids." Defendant Kilaru responded that "he would not order test(s) to determine allergens, nor determine cause of or treat allergies." Defendant Kilaru also refused Plaintiff's request for a special accommodation to prevent his exposure to these allergens.

Every month from December 2009 through June 2010, Defendants Caruso, Martin, Perea, Russell, MDOC, and PHS were informed of the aforementioned conduct of Defendants Cunningham, Filion, Kilaru, Manzardo, Millette, Piazza, but "refused to end the denial(s) of medical care to Plaintiff."

D. Allegation IV

On November 14, 2008, Plaintiff was involuntarily moved into a "common cell" with two other inmates, Defendants Barclay and Portes. Plaintiff was moved in retaliation for "filing grievances and complaints." From November 14, 2008, through, December 23, 2009, Defendants Barclay and Portes knowingly and deliberately "exposed Plaintiff to allergens" causing Plaintiff's

-6-

condition to worsen. Defendants Barclay and Portes also "would stay awake and create loud noises" at night to prevent Plaintiff from sleeping. Defendants Armstrong, Caruso, Harrington, Harwood, Isard, LaLonde, Mackie, Olson, Sibbald, and Woods were informed of the "unnecessary night-time noises and disturbances being caused by Defendants Barclay and Portes," but "took no action." The conduct by Defendants Barclay and Portes was "orchestrated" by unknown officials of the Michigan State Police. On several occasions, Plaintiff requested to be moved to another cell, but his requests were denied by Defendants Harrington, Harwood, Isard, LaLonde, Mackie, Olson, and Woods.

E. Allegation V

Between April 21, 2008, and September 16, 2008, Defendant Berlinger denied several grievances Plaintiff filed. On September 17, 2008, Defendants Berlinger and Woods placed Plaintiff on modified grievance access in retaliation for "Plaintiff's past grievances." On October 21, 2008, Defendant Berlinger denied Plaintiff's request to file a grievance. On October 22, 2008, Defendant Isard, at Defendant Berlinger's request, falsely charged Plaintiff with a major misconduct violation. Between October 24, 2008, and December 23, 2009, Defendant Berlinger denied numerous grievances and/or requests for grievances submitted by Plaintiff.

On three occasions between June 11, 2008, and July 31, 2008, Defendants Armstrong, Ball, Brown, Filion, Laitenen, LaLonde, Mallette, Stephenson, and Woods denied grievances that Plaintiff filed. Defendants Jenkins, Malloy, and Martin (on an unspecified date) denied a grievance that Plaintiff filed. On three occasions between April 30, 2009, and July 21, 2009, Defendants Cunningham and Henson "cancelled Plaintiff's doctor-ordered appointments." Defendant Martin "refused to correct this." On August 18, 2009, Defendant Cunningham "cancelled Plaintiff's doctor-ordered Flagyl

medication." On December 5, 2009, Defendants Filion and Manzardo denied Plaintiff emergency care when Plaintiff was suffering respiratory failure. Between December 23, 2009, and May 26, 2010, Defendants Berlinger, Olson, Perea, Russell, Sibbald, Whitfield, and Woods denied or refused to answer numerous grievances filed by Plaintiff.

In 1997, 2004, October 2008, and February 2010, Defendants Cunnigham, CMS, Kilaru, MDOC and PHS avoided treating Plaintiff by falsely accusing him of suffering from mental illness. In June 2010, Defendant Kilaru refused to issue Plaintiff a special accommodation so that Plaintiff could avoid exposure to "deadly allergens."

Plaintiff alleges that all these actions were undertaken in retaliation for having exercised his constitutional rights.

F.     Allegation VI

As of December 22, 2009, a "medical hold" prevented Plaintiff from being transferred to another facility. On December 22, 2009, Defendant Millette "entered false information in Plaintiff's medical records" removing the medical hold. The following day, Defendants Cunningham, Henson, Olson, and Woods transferred Plaintiff from the Kinross Correctional Facility to the Mound Correctional Facility "in retaliation for asserting rights to proper medical care through grievances and letters."

G. Allegation VII

From April 2009 through May 2010, Plaintiff requested that the MDOC "issue [a] declaratory ruling" regarding certain provisions of the MDOC prisoner grievance policy. The MDOC did not respond to Plaintiff's request. Plaintiff alleges that Defendants MDOC and PHS "say unwritten policy and practice may be used to deny needed medical care, which persons outside prison normally get." Plaintiff asserts that such is not permissible. Plaintiff requests a "declaratory ruling" on these matters as such "would end confusion."

H. Allegation VIII

Plaintiff is a "suspect" in an "ongoing criminal investigation." When questioned on this matter, Plaintiff "continually asserts his right to remain silent." In response, Defendants Armstrong, Barclay, Isard, Newman, Portes, and Woods "subjected Plaintiff to sleep deprivation, threats on his life and well-being, assaults and demanded incriminating responses. . .with the intent to deprive Plaintiff of his right to remain silent and [right to] counsel in the ongoing investigation."

Defendants CMA, Piazza, and Wilson now move to dismiss Plaintiff's claims on the grounds that Plaintiff's allegations fail to state a claim on which relief may be granted.

**STANDARD**

A Rule 12(b)(6) motion to dismiss for failure to state a claim on which relief may be granted tests the legal sufficiency of a complaint by evaluating the assertions therein in a light most favorable to Plaintiff to determine whether such states a valid claim for relief. *See In re NM Holdings Co., LLC*, 622 F.3d 613, 618 (6th Cir. 2000).

As the Supreme Court recently stated, a motion to dismiss will be denied only where the "[f]actual allegations [are] enough to raise a right for relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). As the Supreme Court more recently held, to survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, - - - U.S. - - -, 129 S.Ct. 1937, 1949 (2009). This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." If the complaint simply pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* As the Court further observed:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . .Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. . .Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the wellpleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not "show[n]" - "that the pleader is entitled to relief."

*Id.* at 1949-50 (internal citations omitted).

When resolving a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case, and exhibits attached to the defendant's motion to dismiss provided such are referenced in the complaint

and central to the claims therein. *See Bassett v. National Collegiate Athletic Assoc.*, 528 F.3d 426, 430 (6th Cir. 2008); *see also*, *Continental Identification Products, Inc. v. EnterMarket, Corp.*, 2008 WL 51610 at *1, n.1 (W.D. Mich., Jan. 2, 2008) ("an exhibit to a pleading is considered part of the pleading" and "the Court may properly consider the exhibits. . .in determining whether the complaint fail[s] to state a claim upon which relief may be granted without converting the motion to a Rule 56 motion"); *Stringfield v. Graham*, 212 Fed. Appx. 530, 535 (6th Cir. 2007) (documents "attached to and cited by" the complaint are "considered parts thereof under Federal Rule of Civil Procedure 10(c)").

## ANALYSIS

**I.         Defendant Wilson**

In Counts II, III, and IV of his Second Amended Complaint, Plaintiff alleges that Defendant Wilson denied him appropriate medical treatment and subjected him to sleep deprivation as a form of retaliation. (Dkt. #15 at ¶¶ 131-40). Plaintiff, however, as failed to allege *any* facts to support these allegations. Throughout his Second Amended Complaint, Plaintiff asserts the legal conclusion that Defendant Wilson violated his constitutional rights. (Dkt. #15 at ¶¶ 17, 22, 49, 50, 68). However, the only *factual* allegation Plaintiff makes against Defendant Wilson is that on June 20, 2008, she prescribed a seven-day course of antibiotics. (Dkt. #15 at ¶ 31). Such allegation fails to state a claim on which relief maybe granted. Accordingly, the undersigned recommends that Defendant Wilson's motion to dismiss be **granted** and Plaintiff's claims against her be dismissed.

**II.        Defendant Piazza**

In Counts II, III, and IV of his Second Amended Complaint, Plaintiff alleges that Defendant Piazza denied him appropriate medical treatment and subjected him to sleep deprivation as a form of retaliation. (Dkt. #15 at ¶¶ 131-40). Again, while Plaintiff's Amended Complaint asserts a great many legal conclusions, (dkt. #15 at ¶¶ 17, 22, 49, 50, 68), he has asserted precious few *factual* allegations against Defendant Piazza.

Plaintiff asserts that on three occasions between November 19, 2008, and March 12, 2009, Defendant Piazza prescribed him antibiotics. (Dkt. #15 at ¶ 34). Such fails to state a claim on which relief may be granted. Plaintiff asserts that in March 2009, Defendant Piazza informed him that "past lack of care" was the cause of his airway necrosis. (Dkt. #15 at ¶ 35). This allegation likewise fails to state a claim on which relief may be granted. Finally, Plaintiff asserts that in March 2009, May 2009, and June 2009, Defendant Piazza refused to issue him a Special Accommodation to prevent further exposure to allergens. (Dkt. #15 at ¶ 37). These allegations, if accepted as true, are sufficient "to raise a right for relief above the speculative level."

Accordingly, the undersigned recommends that Defendant Piazza's motion to dismiss be **granted in part and denied in part**. Specifically, the undersigned recommends that Plaintiff's claims against Defendant Piazza be dismissed, except for the claim that in March 2009, May 2009, and June 2009, Defendant Piazza refused to issue Plaintiff a Special Accommodation to prevent further exposure to allergens.

**III.    Defendant CMS**

In Counts II, III, and IV of his Amended Complaint, Plaintiff alleges that Defendant CMS denied him appropriate medical treatment and subjected him to sleep deprivation as a form of retaliation. (Dkt. #15 at ¶¶ 131-40).

CMS is not vicariously liable for the actions of its employees and, therefore, "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)). To establish liability against CMS, Plaintiff must demonstrate that he suffered a violation of his federal rights "because of" a CMS policy, practice, or custom. *Thomas*, 398 F.3d at 429. To demonstrate such, Plaintiff can look to the following: (1) legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations. *Id.*

Plaintiff asserts that CMS acted pursuant to an "unwritten policy and practice to deny necessary medical care." (Dkt. #15 at ¶ 24). To prevail on such a claim, Plaintiff must demonstrate the following: (1) the existence of a "clear and persistent pattern" of illegal activity; (2) that CMS had notice or constructive notice of such; (3) that CMS tacitly approved of the illegal activity, such that "their deliberate indifference in their failure to act can be said to amount to an official policy of inaction" and (4) that the policy, practice, or custom in question was the "moving force" or "direct causal link" in the constitutional deprivation. *Id.* (quoting *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996)).

Plaintiff asserts in various portions of his Second Amended Complaint the legal conclusion that CMS violated his constitutional rights. (Dkt. #15 at ¶¶ 17, 22, 49, 50, 68). Such allegations fail to state a claim on which relief may be granted. The only factual allegation of

wrongdoing that Plaintiff makes against CMS is that on three occasions between July 28, 2008, and September 3, 2008, CMS (and various individuals) failed to provide Plaintiff with "proper medical care." (Dkt. #15 at ¶ 33).

However, none of the individuals against whom this allegation is made are alleged to be employed by or under the control of CMS; they are alleged to be employees of the Michigan Department of Corrections. (Dkt. #15 at 6-12). CMS can only act through its employees or those under its control. By failing to allege that any individual employed by or under the control of CMS denied him treatment on the dates in question, Plaintiff cannot establish that any CMS policy or practice was the "moving force" or "direct causal link" in the constitutional deprivation. In other words, Plaintiff cannot have been injured "because of" a CMS policy if nobody employed by or under the control of CMS is alleged to have committed a wrongful act. Furthermore, while Plaintiff alleges the existence of an "unwritten policy and practice to deny necessary medical care," he has not alleged that CMS knew of or had knowledge of the alleged policy or that CMS approved of the allegedly illegal conduct.

Accordingly, the undersigned recommends that Defendant CMS' motion to dismiss be **granted** and Plaintiff's claims against CMS be dismissed.

## **CONCLUSION**

For the reasons articulated herein, the undersigned recommends that <u>Defendants Piazza, Wilson, and Correctional Medical Services, Inc.'s Motion to Dismiss</u>, (dkt. #84), be **granted in part and denied in part**. Specifically, the undersigned recommends that Plaintiff's claims against Defendants CMS, Wilson, and Piazza be dismissed for failure to state a claim on which relief may be

granted, except for Plaintiff's claim that in March 2009, May 2009, and June 2009, Defendant Piazza refused to issue him a Special Accommodation to prevent further exposure to allergens.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted,

Date: April 6, 2011                                      /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge